JS 44  (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| NIGHT VISION DEVICES, INC. | CARSON INDUSTRIES, INC. |

| (b) County of Residence of First Listed Plaintiff  LEHIGH | County of Residence of First Listed Defendant  FULTON |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| THEODORE H. JOBES, ESQUIRE, FOX ROTHSCHILD LLP 2000 Market Street, 20th Floor, Phila, PA 19103 (215) 299-2000 | |

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*  ·  Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332

Brief description of cause:
Breach of Contract , Tortious Interference and Unfair Competition

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ Injunctive Relief | CHECK YES only if demanded in complaint: JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):*   JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|

| DATE  10/8/19 | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

JS 44 Reverse (Rev. 02/19)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 542 Kemmerer Lane, Allentown, PA 18104 _____

Address of Defendant: _____ 110 Nobel Court, Alpharetta, Georgia 30005 _____

Place of Accident, Incident or Transaction: _____ Allentown, PA _____

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ **is not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/8/19 _____   _____ *Attorney-at-Law / Pro se Plaintiff*   62165 *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☑ 9. All other Diversity Cases
  *(Please specify):* _____ Breach of Contract

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Theodore H. Jobes _____, counsel of record *or pro se plaintiff, do hereby certify:*

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: 10/8/19 _____   _____ *Attorney-at-Law / Pro Se Plaintiff*   62165 *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Night Vision Devices, Inc. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Carson Industries, Inc. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( x )

| | | |
|---|---|---|
| 10/8/19 | Theodore H. Jobes | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-299-2786 | 215-299-2150 | tjobes@foxrothschild.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

**APPENDIX G**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

NIGHT VISION DEVICES, INC.

:
:

V.

:       Civil Action

CARSON INDUSTRIES, INC.

:       No: _____

:
:

## DISCLOSURE STATEMENT FORM

Please check one box:

☑        The nongovernmental corporate party,  _Night Vision Devices, Inc_
, in the above listed civil action does not have any parent corporation and
publicly held corporation that owns 10% or more of its stock.

☐        The nongovernmental corporate party, _____
, in the above listed civil action has the following parent corporation(s) and
publicly held corporation(s) that owns 10% or more of its stock:

_____
_____
_____
_____

10/8/19       _____
Date                                                   Signature

Counsel for:   Plaintiff Night Vision Devices, Inc.
_____

## Federal Rule of Civil Procedure 7.1 Disclosure Statement

(a)    WHO MUST FILE; CONTENTS.  A nongovernmental corporate party must file
two copies of a disclosure statement that:
(1)    identifies any parent corporation and any publicly held corporation
owning10% or more of its stock;  or

(2)    states that there is no such corporation.

(b) TIME TO FILE; SUPPLEMENTAL FILING.  A party must:
(1)    file the disclosure statement with its first appearance, pleading,
petition, motion, response, or other request addressed to the court;
and
(2)    promptly file a supplemental statement if any required information
changes.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NIGHT VISION DEVICES, INC.,

             Plaintiff,

      v.

CARSON INDUSTRIES, INC.,          **CIVIL ACTION NO.**

             Defendant.

## VERIFIED COMPLAINT

Plaintiff, Night Vision Devices, Inc. ("NVD"), by and through its undersigned counsel, files this verified complaint against defendant Carson Industries, Inc. ("Carson"), and in support thereof, alleges the following:

## INTRODUCTION

1.     This is a breach of contract, tortious interference with contractual relations and unfair competition case arising out of Carson's reverse engineering and copying – in violation of the express terms of a written non-disclosure agreement – of a complex and proprietary dual tube, digital binocular night vision device (BNVD) designed, manufactured and sold by NVD.  In addition, in violation of the terms of the non-disclosure agreement, Carson identified and contacted NVD's key suppliers that Carson knew were under exclusive supply contracts with NVD, and acquired or attempted to acquire key component parts of NVD's BNVD, including the optics and main circuit board, which NVD expended significant funds, man-hours and technology to create. If Carson is not enjoined from its unlawful conduct and is permitted to manufacture, exhibit and sell its knock-off of NVD's BNVD, NVD will suffer irreparable harm.

## THE PARTIES

2.      Plaintiff, Night Vision Devices, Inc., formerly known as Night Vision Depot (NVD), is Pennsylvania corporation with its principal place of business and headquarters located at 542 Kemmerer Lane, Allentown, Pennsylvania 18104.

3.      Defendant, Carson Industries, Inc. ("Carson"), is a South Carolina corporation with its principal place of business and headquarters located at 110 Nobel Court, Alpharetta, Georgia 30005.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Section 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      Venue is proper in this district under 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Allentown, Pennsylvania, within this district.

## FACTUAL BACKGROUND

6.      NVD is an Allentown, Pennsylvania manufacturer and seller of night vision equipment, primarily for military and law enforcement uses.

7.      Carson is a Georgia manufacturer of night vision equipment and component parts for night vision equipment.  It is a supplier to, a customer and a competitor of NVD.

8.      Since 2005, NVD has purchased millions of dollars in parts, accessories and PVS-7B/PVS-14 (night vison goggles) kits from Carson.  During this same period, NVD also has sold items to Carson.  These items include parts, accessories and BNVD systems.

## *NVD's BNVD Dual Tube Night Vision Goggles*

9.     Among other products sold by NVD is its BNVD dual tube binocular night vision device.  In 2006, NVD decided to design and build a dual tube night vision goggle that would compete with the L-3 (Litton then Northrop Grumman, now Harris/L-3) AN/PVS-15 and Harris (ITT, then Excelitas, then Harris, now Elbit) AN/PVS-23 systems.  At the time, these two systems were the only dual tube goggles that were available within the United States.  Both of these systems were extremely expensive and both had extremely long delivery times which were in excess of six months.  In 2007, NVD began marketing its dual tube goggle design as the Binocular Night Vision Device (BNVD).  Some of NVD's first sales of this product were to the United States Air Force in late 2007 and early 2008.  Since 2006, NVD has designed multiple new versions of the original BNVD, and in 2014, NVD committed to manufacturing molds for the entire NVD BNVD product line.  Since 2007, NVD has sold more than 4,000 BNVDs worldwide.

10.     Since 2007, NVD has invested between two and three million dollars into its BNVD product line.  These expenses include:

- •     Expenses that went into the original design work of the very first BNVD in 2006;

- •     Expenses that went into production of the first prototypes;

- •     Expenses that went into the validation and testing of not only the first prototypes but the additional re-validation and re-testing that has had to be accomplished every time a new design feature is introduced, or whenever there is a significant component change made to the design;

- •     The subsequent creation of adding dual gain control to the original model in 2007;

- •     The 2011 modification of the original design to create a single gain control version, which included finding a source of supply for the manufacture of a new circuit board which featured the ability of having a single gain control. This effort required finding a qualified source whom NVD could trust and work with in order to design a new circuit board for the entire BNVD

product line.  Investment in the circuit board design has been an ongoing effort for NVD, as major design changes and upgrades have been made to the circuit board from 2011 to present;

• The 2014 design, development and subsequent validation of a dedicated BNVD mold, in which NVD invested in excess of $100,000;

• Subsequent designs with new and improved features such as a new design that utilizes new lighter weight optics, switching from analog switches to new digital push button switches and a new mold for this new push button body, and redesign of the entire battery compartment to allow the BNVD to utilize a much lighter weight AAA battery which has its own removable battery compartment;

• Designs which added the capability to use external battery packs;

• Design, manufacture and testing of several external battery packs for use with the BNVD; and

• The development of new lighter weight optics with a dedicated manufacturer and supplier of optics.  This endeavor including an investment of in excess of $200,000 by NVD and hundreds of hours of in-house engineering costs in order to accomplish the production of these optics.

11.    Carson has never manufactured a dual tube night vision goggle.  NVD has learned that Carson is currently designing a dual tube night vision goggle – using confidential information it obtained from NVD in violation of the express terms of a written non-disclosure agreement – and has exhibited a prototype at an international trade show, in order to compete with NVD.

### _Carson's Requests For Demo NVD BNVDs To Assist In Bid For Colombian Sales_

12.    Since approximately 2015, NVD has allowed Carson to market NVD's BNVD to Carson's customers so long as Carson was not pursuing an opportunity that NVD was already working on.

13.    In September of 2017, NVD was approached by Carson to support Carson with NVD's BNVD for Carson to bid on a sales opportunity to the country of Colombia.  Because NVD

was not currently pursuing any opportunities to sell its BNVD in Colombia, NVD quoted Carson 60 BNVDs for Colombia on September 20, 2017 at a price of $412,500.00.

14.     At the Association of the United States Army ("AUSA") show in October 2017, Carson informed NVD that Carson had won an opportunity to sell 50 NVD BNVDs in Colombia. Carson subsequently placed a purchase order with NVD for these 50 BNVDs.

15.     Since 2017, NVD also has supported Carson on several other opportunities to bid on sales in South America; however, the only opportunity of which NVD is aware that Carson won, was for the 50 BNVDs in Colombia.

16.     In September of 2018, almost one year after it had won the opportunity to sell 50 NVD BNVDs in Colombia, Carson, for the first time, requested that NVD provide Carson with a sample BNVD.  The requested sample BNVD featured NVD's new digital push button switch upgrade.  Carson requested the sample digital BNVD under the premise that Carson wanted to demonstrate that system to the Colombians in pursuit of a new opportunity worth up to 1000 or more NVD BNVDs.  NVD provided Carson with a demo system of this design type in reliance on Carson's representation that it was being used for the purpose of attempting to gain a large sale for Carson of NVD's BNVD goggles.  Significantly, the previous version of BNVDs that Carson had sold to the Colombians was the older analog switch version; the new digital version features a much lighter weight than the older analog switch design.  Carson then retained this demo system from September 2018 through January of 2019.

17.     Prior to allowing Carson to have a BNVD sample for the first time in September 2018, William H. Grube, III, the President and CEO of NVD, had spoken with Richard J. ("Dick") Barrett, the Executive Vice President of Carson, about NVD's BNVD and inquired what Carson's future plans were, at the Special Operations Forces Industry Conference ("SOFIC") trade show in

-5-

Tampa, Florida in May 2018. During that conversation, Mr. Barrett told Mr. Grube that Carson was not going to build its own dual tube goggles. It was only because Mr. Grube had received this assurance from Mr. Barrett that Mr. Grube authorized shipment of the first demo BNVD to Carson a few months later in September 2018.

18.     Nevertheless, because Mr. Grube was under the belief that in the past, Carson had reverse engineered products of other manufacturers in order to create many of the products that it sells, including many of its parts and accessories for its AN/PVS-7B and AN/PVS-14 product lines, in October 2018, NVD requested that Carson sign NVD's Non-Disclosure Agreement (discussed below and attached as Exhibit "A"). Carson agreed.

19.     In addition, NVD learned on or about October 8, 2018 at the AUSA show in Washington D.C. that Carson might be attempting to build its own dual tube night vision goggle. This was another reason why NVD required Carson to sign a Non-Disclosure Agreement on October 18, 2018.

20.     Carson returned the sample BNVD used in connection with the Colombian sales effort, to NVD in January 2019.

21.     In early 2019, Mr. Grube spoke to Mr. Barrett and once again Mr. Barrett assured Mr. Grube that Carson was not working on building its own dual tube goggle to compete against NVD.

22.     In May 2019, Carson again requested that NVD furnish the same demo digital push button BNVD system for a second time and represented that Carson needed the demo BNVD so that it could again take the sample back to Colombia for the purpose of attempting to generate additional sales of NVD's BNVD. The October 2018 Non-Disclosure Agreement was in effect at this time.

### *Carson's Scheme To Reverse-Engineer NVD's BNVD In Violation Of The NDA*

23.     However, NVD now believes that Carson did not intend in May 2019 to use the sample NVB BNVD to generate sales opportunities in Colombia for Carson to sell NVD's product; but rather, that the sole reason why Carson requested this sample again was so that it could reverse engineer NVD's BNVD in order to then introduce the Colombians to Carson's own knock-off design and to capture what is now a 1000 to 1500 dual tube goggle opportunity in Colombia.

24.     Carson retained NVD's demo push button BNVD design since May 2019, despite several requests for it to be returned and despite agreeing in its purchase order that it would return the sample on July 1, 2019. Carson finally returned the sample on October 7, 2019 under the threat of litigation.

25.     Upon initial review by NVD of the just-returned sample BNVD, it appears that Carson had disassembled NVD's BNVD demo system. There would have been no reason for Carson to have taken apart the NVD BNVD for the stated purpose under which Carson had acquired the sample – to use it to make sales to the Colombian government. Rather, the only reason why Carson disassembled the BNVD was so that it could reverse-engineer it in violation of the Non-Disclosure Agreement.

26.     As discussed in more detail below, Carson introduced a new digital push button dual tube goggle design that is virtually identical to NVD's BNVD at a trade show in September 2019, going so far as to call it by the same acronym (BNVD). The timing of the introduction of Carson's knock-off BNVD makes clear that Carson was working on the product's design while Carson had NVD's demo goggle in its possession pursuant to a Non-Disclosure Agreement. In addition, as is also discussed in more detail below, NVD has learned that Carson identified the vendors of two of the most important component parts of NVD's BNVD (optics and the main

circuit board) and that Carson made contact with these two key component part manufacturers for the purpose of buying or seeking to buy the component parts, during this same time period.  NVD believes that Carson learned the identity of the two vendors by opening up NVD's demo BNVD and analyzing the optics and main circuit board and that it used such confidential information in violation of the NDA.

27.   NVD believes that, after Carson won the contract and delivered the first 50 NVD BNVDs to Colombia, the Colombians were impressed with these goggles and requested to buy more.  Indeed, Carson informed NVD several times that the Colombians were looking at buying an additional 500 to 1000 or more NVD BNVD goggles, which is why Carson requested the push button Demo BNVD in September 2018.  NVD further believes that at some point after the demo system had been returned to NVD in January 2019, the Colombians informed Carson that they were going forward with a new large purchase of the NVD push button digital BNVD, and in May 2019, Carson again requested the NVD push button BNVD sample so it could reverse engineer the BNVD to the point where Carson could manufacture its own competing digital dual tube goggle.  This would not only allow Carson to capture the entire new Colombian opportunity, it would also allow Carson to compete with NVD across the rest of the dual tube goggle marketplace, which now is a worldwide opportunity worth billions of dollars over the next 5 to 10 years.

28.   During this same timeframe (2017 through 2019), NVD has had numerous opportunities to market its BNVD goggle in Colombia through both direct sales and through other representation, and NVD has declined to pursue these opportunities because it elected to allow Carson to market the NVD BNVD in Colombia.  Had NVD known that Carson was secretly working behind NVD's back to reverse engineer NVD's system and then sell the knock-off product directly to the Colombians, NVD would have pursued these Colombian opportunities

directly, and would likely have won the opportunity for 50 systems and the upcoming opportunity for up to 1000 to 1500 systems (worth approx. $7,500,000 to $11,250,000), due to the much lower pricing that NVD would have offered by not having both Carson's and Carson's sales representative's margins added to NVD's pricing, and the fact that the Colombians had already purchased and were happy with NVD's products.

29.     In a March 2018 e-mail, Carson employee Russell Smith confirmed Carson's understanding that there was an opportunity to sell 550 BNVDs to Colombia initially, and additional quantities in subsequent years for a total of 1500 BNVDs for Colombia in 2019 and 2020. This opportunity is worth approximately $11 million.

30.     Carson has been stringing NVD along with the belief that Carson is only representing NVD's BNVD in Colombia and therefore keeping NVD from selling NVD's products directly in Colombia, while at the same time Carson was reverse engineering NVD's BNVD so that Carson can then switch the Colombians from NVD's BNVD to Carson's knock off goggle. Carson intentionally lulled NVD into believing that Carson was going to sell NVD products in Colombia when, in fact, Carson was simply buying time so it could reverse engineer and copy NVD's BNVD and then cut NVD out of the Colombian sale altogether.

### *The Non-Disclosure Agreement*

31.     As set forth above, in connection with sending a sample of its BNVD to Carson, NVD required, and Carson agreed, that the parties would enter into a Mutual Non-Disclosure Agreement. Accordingly, on October 18, 2018, Carson and NVD signed a written Mutual Non-Disclosure Agreement (the "NDA"). A copy of the NDA is attached as Exhibit "A".

32.     The NDA defines "Confidential Information" to include "any written, audible, visual or oral information *or physical items* disclosed by a party relating to such party's business,

operations, strategy, customers and potential customers, *products or technology*...." (Emphasis added.) *See* NDA at ¶ 1.

33.     The NDA prohibits any party from using or disclosing the other party's Confidential Information.  Specifically, the NDA states, "The receiving party may not disclose any of the other party's Confidential Information to any third party, *or copy or use any Confidential Information for any purpose not in the furtherance of the relationship contemplated by the parties*, without the prior consent of the other party and then only to the extent specified in such consent." (Emphasis added.) *See* NDA at ¶ 2.  The NDA also expressly prohibits reverse engineering. *Id.*

34.     NVD did not give prior written consent for Carson to reverse engineer and copy NVD's BNVD product and such reverse engineering and copying was not in the furtherance of the relationship contemplated by NVD and Carson.

35.     The NDA further states, "[t]he disclosing party shall retain all intellectual property rights as to its Confidential Information.  Neither party is granted any license or other rights under any patents, copyrights, trade secrets or other intellectual property rights under this Agreement." *See* NDA at ¶ 4.

36.     The NDA requires the return of all Confidential Information within five (5) business days of a written demand by the disclosing party, along with a letter, signed by an officer of the receiving party that the Confidential Information "has in no way been copied and that any remaining copies not returned to the requesting party have been destroyed." *See* NDA at ¶ 8.

37.     In its purchase order requesting the demo BNVD, Carson promised to return the demo by July 1, 2019.  In its invoice for the demo unit – provided at no charge to Carson – NVD

included a written demand that the BNVD sample be returned on or before July 1, 2019.  Copies of Carson's purchase order and NVD's invoice are attached as Exhibit "B".

38.     Despite demand, Carson failed and refused to return NVD's Confidential Information, including the sample BNVD, to NVD, until it did so on October 7, 2019 under the threat of litigation, and not until after it had completed its reverse-engineering and creation of a prototype knock-off BNVD goggle.  Moreover, Carson has not submitted a letter to NVD from an officer of Carson stating that NVD's Confidential Information "has in no way been copied and that any remaining copies not returned to the requesting party have been destroyed."

39.     Instead, as described in more detail below, Carson has retained NVD's Confidential Information and has used that information to reverse engineer, copy and produce a "knock-off" of NVD's BNVD product for purposes of selling such a product to the public.

40.     The NDA, which is governed by Pennsylvania law (*see* NDA at ¶ 10), states, "[t]he parties acknowledge that a violation of this Agreement would cause irreparable harm to the other party for which no adequate remedy at law exists, and each party therefore agrees that, in addition to any other remedies available, the aggrieved party shall be entitled to seek injunctive relief to enforce the terms of this Agreement.  The aggrieved party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred because of any legal action arising in relation to this Agreement." *See* NDA at ¶ 7.

### ***Carson's Knock-Off BNVD Goggles***

41.     Carson first exhibited its new dual tube binocular night vision device to the public at the Defence & Security Equipment International ("DSEI") trade show in London, United Kingdom from September 10, 2019 through September 13, 2019.

42.     At the DSEI show in London, an attendee was handed the Carson BNVD knock-off system and told Carson employee Russell Smith that it looked just like NVD's BNVD. Russell Smith replied that the reason for the similar look and feel was that Carson had "copied the best aspects of everyone [else's] goggles." This statement is telling in that, to the best of NVD's knowledge, Carson only had possession of NVD's BNVD system at the time Carson produced its new dual tube binocular night vision system.

43.     Below on the left is a photograph of Carson's unit taken at the DSEI show in the U.K. as compared to NVD's BNVD on the right:

 

44.     The photograph makes clear that the push buttons on the left side are identical to NVD's BNVD product, as is the IR illuminator on the front. NVD also believes that there are numerous other exterior and interior features that are identical.

45.     The marketing data sheet from Carson for its new BNVD product, a copy of which is below, shows that many features are identical to and were copied from NVD's BNVD product:



46.    The IR LED spot/flood is identical to NVD's product; the push buttons are identical, and the shape of the entire upper body is identical, including mounting the dovetail attachment on the top with the same 4 screw system NVD uses for its product.  In addition, the

battery compartment looks identical, and the monocular cut off when rotated up appears to be virtually identical to NVD's product. It also appears that the monocular tension system in the monocular arms are identical.

47.    The monocular cutoff when rolled up is a feature that NVD was first to introduce to the U.S. market in 2015. NVD believes that Carson reverse-engineered this feature from NVD's demo BNVD since it is not something that could easily be engineered from scratch.

48.    Further, unlike most other current manufactures of binocular night vision devices that compete with NVD's BNVD product, Carson is marketing its new goggle using the exact same name that NVD uses – BNVD – in order to cause market confusion. NVD has used the acronym Binocular Night Vision Device (BNVD) since 2006. In this regard, in 2011 the United States Navy began calling the AN/PVS-31 the BNVD; however, no one ever uses this acronym for this product and it is simply referred to as the PVS-31. FLIR, another manufacturer, also began using the same acronym, but FLIR added numbers behind BNVD and its system is called the BNVD-51. The other manufacturers currently selling similar products either use names like Sentinal, or they give the products numbers such as PVS-31, 5032, 1531, PS-15, etc.

49.    As part of its reverse-engineering of NVD's BNVD goggles, Carson has learned the identities of the suppliers of key components of the BNVDs – including the optics supplier and the main circuit board supplier – and has approached these key component suppliers and has purchased or attempted to purchase the key component parts. Carson has done so notwithstanding the fact that NVD has exclusive supply contracts with these key component suppliers and that NVD invested substantial sums, and contributed confidential technology and trade secrets, to develop the key component parts of NVD's BNVD.

50.     On or around January 23, 2019, during the Shot Show in Las Vegas, Nevada, NVD learned that Carson had approached NVD's optics manufacturer to attempt to purchase NVD's Light Weight (UL Model) optics.  These optics were developed through a joint venture between NVD and the optics manufacturer, and NVD invested more than $200,000 in this project.  Pursuant to the agreement the optics manufacturer has with NVD, the optics manufacturer has the ability to sell these optics to a third party, but only if the optics manufacturer pays NVD a reimbursement fee of $100,000 (to reimburse NVD for a portion of its investment in the development of the optics).  To date, the optics manufacturer has not paid NVD any reimbursement fee and has claimed that it has not yet sold NVD's optics to anyone other than NVD.  However, the optics manufacturer has acknowledged that it loaned Carson several sets of sample optics.  These are the optics that Carson used in its dual tube goggle prototype that was revealed at the DSEI show in the United Kingdom in September 2019.  NVD believes that Carson approached the optics manufacturer while under the constraints of Carson's NDA which was signed in October 2018.

51.     NVD has an exclusive supplier for NVD's main circuit board in its BNVD goggle. NVD spent considerable sums of money and time, and contributed confidential technology and trade secrets, to design and update/refine the main circuit board.  To protect its significant investment in the main circuit board, NVD has an exclusivity agreement with the circuit board manufacturer, as well as an NDA that is still in effect.  Nevertheless, the circuit board manufacturer has acknowledged that it was approached by Carson and has been working with Carson to build circuit boards for Carson, including boards for Carson's dual tube goggle that it designed by reverse-engineering NVD's BNVD.

52.     As of today, NVD is the only manufacturer to have developed a dual tube night vision goggle with digital push buttons.  (There are several manufacturers that make dual tube goggles with analog/digital switches which the user turns.)

53.     Apart from the knock-off product that Carson is designing by reverse-engineering NVD's BNVD in violation of the NDA, all of the other dual tube night vision goggles produced by other manufacturers have a completely different look and feel than NVD's BNVD. *See, e.g.,* https://www.eotechgear.com/binocular-night-vision-device-bnvd-an-pvs-31a-white-phosphor (L-3  AN/PVS-31);   https://anvsinc.com/product/binocular-night-vision-device-bnvd-1531/   (L-3 1531);   https://www.thenightvisionoptics.com/product/us-night-vision-harris-f5032-lightweight-night-vision-binocular-white-phosphor-005032/              (Harris/Elbit              5032); https://www.flir.com/products/bnvd-51/ (FLIR Dual Tube); https://tnvc.com/shop/tnv-sentinel-binocular-night-vision-system-l-3-omni-viii/         (Adams         Industries         Sentinal); https://www.abnightvision.com/pages/mod-3-info   (AB   Night   Vision   Mod   3);   and https://www.atncorp.com/atn-ps15-4-night-vision-goggles (ATN PS-14).  To the best of NVD's knowledge, these are all of its domestic competitors for dual tube night vision goggles.  None of them are even close to having the look and feel of NVD's BNVD product line, except the new prototype Carson BNVD.

## *NVD Will Suffer Irreparable Harm If Carson Is Not Enjoined*

54.     As set forth above, Carson is blatantly and willfully attempting to compete unfairly with NVD by reverse-engineering and copying NVD's BNVD goggle, including acquiring or seeking to acquire key component parts such as optics and the main circuit board which NVD paid to develop from suppliers who have exclusive contracts with NVD, all in violation of the written

NDA, and in creating a product that intentionally copied the look and feel, and name, of NVD's BNVD goggles.

55.     NVD is a successful business in Allentown, Pennsylvania.  The company's headquarters, warehouse, manufacturing and distribution facilities are all located in Lehigh County, Pennsylvania.  NVD employs approximately 29 people, 27 of whom live in Eastern Pennsylvania.

56.     NVD has invested extensive time, effort and money in developing its BNVD dual tube night vision goggles, including developing the key component parts and supply chain relationships, brand recognition and establishing its valuable goodwill and reputation.

57.     Carson has blatantly sought to usurp NVD's goodwill and to steal NVD's technology by, *inter alia*, using NVD's Confidential Information in violation of a written NDA to reverse-engineer and copy NVD's BNVD dual tube digital goggles and to obtain key component parts – including optics and the main circuit board – which NVD invested substantial sums of money, man-hours and technology to create, from suppliers who have exclusive contracts with NVD, in order to bolster Carson's own sales and/or market share to NVD's detriment and expense.

58.     Carson's unlawful acts are directed into the Eastern District of Pennsylvania and the harm therefrom is felt and experienced in the Eastern District of Pennsylvania.

59.     Further, the harm associated with Carson's wrongful conduct is, by its very nature, irreparable and NVD lacks an adequate remedy at law.

## CLAIMS AND CAUSES OF ACTION

### COUNT I

#### *Breach of Contract*

60.     NVD incorporates by reference the allegations in paragraphs 1 through 59 above.

61.     NVD and Carson are parties to a binding, written contract (the NDA), pursuant to which Carson agreed that it would not use or disclose NVD's Confidential Information.

62.     NVD has performed all of its obligations under the contract.

63.     Carson has breached the contract by using NVD's Confidential Information to reverse engineer NVD's BNVD product and to develop, manufacture and offer for sale a knock-off of NVD's product.

64.     Carson also has breached the contract by using NVD's Confidential Information to identify and contact NVD's suppliers, and to acquire or seek to acquire key component parts, including optics and the main circuit board, which NVD invested substantial sums of money, man-hours and technology to develop, to use in Carson's knock-off BNVD product.

65.     As a direct and proximate result of Carson's breach of contract, NVD has been harmed.

66.     As a direct and proximate result of Carson's breach of contract, NVD has sustained and, if Carson is not enjoined, will continue to sustain, irreparable harm.

### COUNT II

#### *Tortious Interference With Contractual Relations*

67.     NVD incorporates by reference the allegations in paragraphs 1 through 66 above.

68.     NVD has legally valid and binding contractual relationships with numerous component part suppliers for its BNVD dual tube night vision goggles, including exclusive supply

contracts for the optics and main circuit board used in the BNVD.  NVD expended significant sums of money, man-hours and technology to help develop, update and refine the optics and main circuit board for the BNVD.  NVD was entitled to receive the substantial benefits from its contracts with its suppliers.

69.     At all material times, improperly using NVD's Confidential Information in violation of the NDA, Carson knew of NVD's contractual relationships with NVD's component part suppliers, including the exclusive supply agreements with the optics and main circuit board suppliers.

70.     By identifying, contacting and acquiring, or seeking to acquire, component parts, including optics and the main circuit board, from suppliers who are parties to exclusive supply agreements with NVD, Carson sought to unlawfully and wrongfully induce the component part suppliers to breach their exclusive supply contracts and end or reduce their relationships with NVD.  As a result, Carson unlawfully and wrongfully interfered with those relationships and NVD's contractual rights.

71.     Carson has acted intentionally, maliciously and willfully in interfering with NVD's contractual rights under its agreements with its component part suppliers.

72.     As a direct and proximate result of Carson's unlawful and wrongful interference with NVD's contracts with its component part suppliers and NVD's rights under those agreements, NVD has been damaged.  Among other things, Carson has gained access to, or will gain access to if not enjoined, key component parts including optics and the main circuit board, that NVD spent years and substantial sums of money, man-hours and technology to create, without having to make any investment whatsoever.

73.     As a direct and proximate result of Carson's unlawful and wrongful interference with NVD's contracts with its component part suppliers and NVD's rights under those agreements, NVD has sustained and, if Carson is not enjoined, will continue to sustain, irreparable harm.

74.     Carson's conduct, as alleged herein, was intentional, outrageous, willful and wanton.

## COUNT III

### *Common Law Unfair Competition*

75.     NVD incorporates by reference the allegations in paragraphs 1 through 74 above.

76.     Carson is intentionally copying the distinct look and feel of NVD's BNVD dual tube goggles, is using the name "BNVD", and is trying to pass off its brand new knock-off dual tube night vision goggles as being identical to NVD's products.

77.     Carson is disparaging NVD's BNVD product by misleading consumers as to the origin of Carson's dual tube night vision goggles.

78.     Carson has entered the market for dual tube night vision goggles, which was already occupied by NVD – a rival of established reputation in the United States – and has unnecessarily created and increased confusion between NVD's products and Carson's products.

79.     Carson's use of the intentionally copied look and feel, and designation "BNVD", is likely to produce confusion in the public mind.

80.     By reason of Carson's unfair competition, NVD has sustained, and will continue to sustain, substantial damages.

81.     As a direct and proximate result of Carson's unfair competition, NVD has sustained and, if Carson is not enjoined, will continue to sustain, irreparable harm.

82.     Additionally, Carson has been unjustly enriched as a result of its acts of unfair competition.

83.     Because Carson's acts of unfair competition were both willful and malicious, NVD is entitled to an award of punitive damages and attorneys' fees and an injunction prohibiting Carson from using NVD's Confidential Information and supply channels to create a knock-off of NVD's BNVD dual tube night vision goggles.

## JURY DEMAND

Plaintiff Night Vision Devices, Inc. demands a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Night Vision Devices, Inc. respectfully requests that the Court:

(1)     Find and enter Judgment in Plaintiff NVD's favor against Defendant Carson on Plaintiff's Claims for Relief, Counts I, II and III;

(2)     Enter a temporary restraining order, and a preliminary and then permanent injunction, restraining, prohibiting and enjoining Defendant Carson from (i) using NVD's Confidential Information in violation of the NDA, (ii) tortiously interfering with NVD's contractual relationships with its component part suppliers, including NVD's exclusive supply agreements with its optics and main circuit board suppliers, and (iii) unfairly competing with NVD by selling, offering to sell, or demonstrating to customers and at trade shows, a dual tube digital night vision goggle with the same look and feel as NVD's BNVD product and using the acronym "BNVD";

(3)     Award Plaintiff NVD compensatory damages caused by Defendant Carson's breach of contract, tortious interference with contractual relations, and unfair competition, in an amount to be established at trial and for which Carson shall be liable;

(4)     Award Plaintiff NVD punitive damages as a result of Defendant Carson's intentional, outrageous, willful and wanton conduct, in an amount sufficient to deter such conduct in the future;

(5)     Award Plaintiff NVD its reasonable attorneys' fees in this action as required by the terms of the NDA;

(6)     Award Plaintiff NVD its costs in this civil action; and

(7)     Award such other and further relief as the Court deems just and equitable.


Theodore H. Jobes, Esquire
 Pennsylvania Atty. No. 62165
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA  19103
(215) 299-2786
(215) 299-2150 (fax)
tjobes@foxrothschild.com

Attorney for Plaintiff,
Night Vision Devices, Inc.

Dated:  October 8, 2019

## <u>VERIFICATION</u>

I, William H. Grube, III, certify that I am the President and CEO of Night Vision Devices, Inc., the Plaintiff in this action, and am authorized to make this verification on its behalf. I verify that the statements set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsifications to authorities.

_____
William H. Grube, III

Dated:  October 8, 2019

# EXHIBIT "A"



Night Vision Devices, Inc.
PO BOX 3415
Allentown, PA 18106-9021
Ph:   610-395-9743
Fax:   610-395-9744
Email: sales@nvdevices.com
www.nvdevices.com
CAGE: 36ZQ7

## MUTUAL NON-DISCLOSURE AGREEMENT

THIS MUTUAL NON-DISCLOSURE AGREEMENT is entered into on October 18, 2018 between **NIGHT VISION DEVICES, INC.** , a Pennsylvania corporation having a principal place of business at **542 Kemmerer Lane Allentown, PA 18104**, and **CARSON INDUSTRIES, INC.**, a South Carolina corporation having a usual place of business at **110 Nobel Ct, Alpharetta, GA 30005.**

The parties may be disclosing to each other Confidential Information (as defined below), and neither party would make such disclosures without the receiving party's agreement to maintain confidential treatment of such Confidential Information in accordance with the terms hereof.  Therefore, both parties agree to the following:

**1.    Definition of Confidential Information.** "Confidential Information" shall consist of any written, audible, visual or oral information or physical items disclosed by a party relating to such party's business, operations, strategy, customers and potential customers, products or technology which (a) if disclosed in written form, is labeled as confidential, proprietary or the like, (b) if disclosed orally, is identified as confidential or proprietary at or prior to disclosure and is identified as Confidential Information in a written format (e.g. meeting minutes) within fourteen days of such oral disclosure.

**2.    No Disclosure or Use.**  The receiving party may not disclose any of the other party's Confidential Information to any third party, or copy or use any Confidential Information for any purpose not in furtherance of the relationship contemplated by the parties, without the prior written consent of the other party and then only to the extent specified in such consent.  Confidential Information may be disseminated within the receiving party's own organization only to the extent reasonably required for the purposes hereof and in any, independent contractors and representatives who have entered into appropriate confidentiality agreements.  The receiving party may not modify, adapt, reverse engineer or recreate any software or documentation provided by the other party (or attempt to do so).  Each party agrees not to make any public disclosure regarding their discussions without the other party's prior written approval.

**3.    Exceptions.**  The restrictions on the disclosure and use of Confidential Information described in Paragraph 2 do not extend to any item of Confidential Information which:  (a) is publicly known at the time of its disclosure; (b) is lawfully received by the receiving party from a third party not bound in a confidential relationship to the other party; (c) is published or otherwise made known to the public by the disclosing party; (d) was generated independently by the receiving party without use of the Confidential Information in question; or (e) is requested or required to be disclosed by an order of a governmental agency, legislative body or court of competent jurisdiction, provided that (1) the receiving party provides the disclosing party with immediate notice of such request or requirement so that the disclosing party may seek a protective order or appropriate remedy, and (2) the receiving party uses best efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information so disclosed.

**4.    No License or Warranties.**  The disclosing party shall retain all intellectual property rights to its Confidential Information.  Neither party is granted any license or other rights under any patents,



Night Vision Devices, Inc.
PO BOX 3415
Allentown, PA 18106-9021
Ph:   610-395-9743
Fax:  610-395-9744
Email: sales@nvdevices.com
www.nvdevices.com
CAGE: 36ZQ7

copyrights, trade secrets or other intellectual property rights under this Agreement.   Neither party makes any warranties or representations, express or implied, concerning its Confidential Information.

**5.   Inadvertent Disclosure.**   In the event Confidential Information is inadvertently or accidentally disclosed, the receiving party shall notify the disclosing party in writing within five (5) business days of discovery of the disclosure, and shall take all necessary precautions to avoid further dissemination of the information disclosed, as well as precautions to prevent disclosure of any additional information.

**6.   Export.**   The receiving party agrees that it will not export, re-export or divert any Confidential Information for which the government of any country or any governmental agency thereof requires an export license or other governmental approval without first (a) informing the disclosing party of its desire to export, re-export or divert Confidential Information, and (b) obtaining such license or approval.

**7.   Irreparable Harm.**   The parties acknowledge that a violation of this Agreement would cause irreparable harm to the other party for which no adequate remedy at law exists, and each party therefore agrees that, in addition to any other remedies available, the aggrieved party shall be entitled to seek injunctive relief to enforce the terms of this Agreement. The aggrieved party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred because of any legal action arising in relation to this Agreement.

**8.   Return of Confidential Information.**   Upon termination of this Agreement or within five (5) business days of a written demand by the disclosing party, all Confidential Information, together with any copies, in any media, shall be returned to the disclosing party, along with a letter, signed by an officer of such party, confirming that the Confidential Information has in no way been copied and that any remaining copies not returned to the requesting party have been destroyed..   The return of any Confidential Information will not relieve the receiving party of its obligation to maintain the confidentiality of the Confidential Information in accordance with the terms hereof.

**9.   Term.**   This Agreement shall have a term of three (3) years from the date of the last signature herein. The parties' obligations shall survive termination for a period of five (5) years following the date the Confidential Information in question was disclosed.

**10.   General.**   Neither party may assign its rights or delegate its duties or obligations under this Agreement without the other party's prior written consent.  This Agreement expresses the entire understanding and agreement of the parties and supersedes all other prior agreements, oral or written, and all other communications between the parties relating to its subject. This Agreement may not be altered or amended without the express written agreement of both parties.  Waiver of any provision of this Agreement by a party shall not constitute a waiver of any other provision or waiver of the same provision at any other time.   This Agreement shall be binding on both parties and their respective successors and assigns and shall be governed by the laws of the Commonwealth of Pennsylvania.



Night Vision Devices, Inc.
PO BOX 3415
Allentown, PA 18106-9021
Ph:   610-395-9743
Fax:   610-395-9744
Email: sales@nvdevices.com
www.nvdevices.com
CAGE: 36ZQ7

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives.

NIGHT VISION DEVICES, INC.

By: _____

Name: _William H Grobe III_

Title: _CEO_

Date: _10-23-2018_

CARSON INDUSTRIES, INC.

By: _____

Name: _Richard J Barrett_

Title: _Exec VP_

Date: _10/18/2018_

# EXHIBIT "B"



Page: 1

# INVOICE

**NIGHT VISION DEVICES, INC.**
**P.O. BOX 3415**
**ALLENTOWN PA 18106**

**Phone: 610-395-9743  Fax: 610-395-9744**
**website: www.nvdevices.com**

| | |
|---|---|
| INVOICE NUMBER: | 0034345-IN |
| INVOICE DATE: | 5/30/2019 |
| ORDER NUMBER: | 0022429 |
| ORDER DATE: | 5/30/2019 |
| CUSTOMER NO.: | CARS001 |
| CUSTOMER P.O. NO.: | DEMO |

| SOLD TO: | SHIP TO: |
|---|---|
| CARSON INDUSTRIES<br>54 SAW TIMBER DRIVE<br>HILTON HEAD ISLAND  SC  29926 | CARSON INDUSTRIES INC<br>110 NOBEL COURT<br>ALPHARETTA, GA  30005 |

| SHIP VIA | TRACKING NUMBERS | TERMS |
|---|---|---|
| UPS NEXT DAY | 1ZY2689V2496966872; | DEMO UNIT TO BE RETURNED |

| ITEM NUMBER | UNIT | ORDERED | SHIPPED | BACK ORDERED | PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| *NVD-BNVD | EACH | 1 | 1 | 0 | 0.00 | 0.00 |
| NVD-BNVD-450507  SN:20903 | | | | | | |
| *1960010-5 | EACH | 1 | 1 | 0 | 0.00 | 0.00 |
| LOSTO HELMET MOUNT, MODIFIED | | | | | | |

TO BE RETURNED TO NVD, 542 KEMMERER LANE, ALLENTOWN, PA  18104 BY JULY 1ST, 2019

EXPORT OF THE COMMODITIES DESCRIBED HEREIN IS STRICTLY PROHIBITED WITHOUT A VALID EXPORT LICENSE ISSUED BY THE U.S. DEPT. OF STATE, OFFICE OF MUNITIONS CONTROL PRESCRIBED IN THE INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR) TITLE 22, CODE OF FEDERAL REGS PARTS 121-128

| | |
|---|---|
| NET INVOICE | 0.00 |
| FREIGHT: | 0.00 |
| SALES TAX: | 0.00 |
| **INVOICE TOTAL:** | **0.00** |

ACCOUNTS NOT PAID WITHIN 30 DAYS OF THE DATE OF THE INVOICE ARE SUBJECT TO A  1.5% MONTHLY FINANCE CHARGE.



NIGHT VISION DEVICES

# Demo Hardware Request Form

Form 400183  Rev. A

November 1, 2018

**Instructions:** Fill in all pertinent information below. Communicate any changes that occur after this request has been released to Operations by marking/signing the original in RED providing to ALL affected parties. Fill out this form as soon as information is available to ensure that requested materials are on hand.

| Name: | Carson Ind. |
| Address: | 110 Nobel Ct |
|  | Alpharetta GA 30005 |
| Phone: |  |
| Purpose of Demo: | Columbia Demo |

## Intended Customer / Purpose of Demo Hardware

| Request Date: | 5/22/2019 |
| Required Date: | 5/31/2019 |
| Ship Date: | 5/30/2019 |
| Return Date: | 7/1/2019 |

Please be sure to include all applicable information regarding the systems needed for demo. IE: System Specifics, tube type(FOM if applicable), glass type, special accessories needed. Please also list any specific items that need to ship with the systems. If a full kit is not needed please list as System only.

| Qty: | Part Number: | Description: | Notes: |
|---|---|---|---|
| 1 | NVD-BNVD-40507 | Push Button (2) w/ BNVD-AA, UL, Std Acc pkt | S/N 20903 |
| 1 | 96000-5 | Lo-Sto Mount, Modified |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Form 400183  Rev. A

November 1, 2018

| Qty: | Part Number: | Description: | | | | | | | | | | | | | | | | Notes: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |

**Approval Signature(s): CEO for Bailments/Demos, Dir. of Operations for Tradeshow Eqpt.**

Michael W. Graham

OK for Bill's email

**Date:** 5/30/2019



# CARSON
## INDUSTRIES
110 Nobel Ct, Alpharetta, GA 30005
TEL: +1 770.753.4403
FAX: +1 844.572.9031
www.carson-industries.com

## Purchase Order No:   190230
Page 1 of 1

*Attention:* **Michael Graham**

**Night Vision Devices**
542 Kemmerer Lane
Allentown, PA  18104-0415
USA
Phone:   (610) 395-9743
Fax:      610-395-9744

| Order Date | Due Date | Ship Via | Terms | Account ID | Buyer |
|---|---|---|---|---|---|
| 5/22/2019 | 5/29/2019 | FedEx - Ground | NET 30 | | Doreen Grant |

| Line | Part ID/Description | Rev | U/M | Tax | Quantity | Unit Price | Extd Price |
|---|---|---|---|---|---|---|---|
| 1 | LIGHT WEIGHT BNVD<br>Light Weight BNVD with White tubes | | BO | $0.00 | 1 | 0.00000 | $0.00 |

**NVD will loan Carson Ind. the light weight
binocular for demo in Colombia**

**Lead Time 0.00 days**
**Due Date 5/29/2019**        *Return Date   7/1/2019*

Please acknowledge receipt of this PO.

Please ship FedEx Ground against account # 489501562. If FedEx is unavailable, please ship UPS Ground
against account # 05w9e4. Please do not insure.

| **Approved By:** _____ | Order Sub Total : | $0.00 |
|---|---|---|
| | Tax : | $0.00 |
| | **Order Total :** | **$0.00** |

## Michael Graham

| | |
|---|---|
| **From:** | Russell Smith <russell.smith@carson-industries.com> |
| **Sent:** | Friday, August 31, 2018 10:26 AM |
| **To:** | Michael Graham |
| **Cc:** | Richard Barrett; Richard Barrett; Maria Estrada |
| **Subject:** | RE: Demo units |

Mike,
Right now my plans are to be in Colombia Monday September 11 thru Wednesday September 13...But I am at the mercy of getting the License in from the State Department.
(License has been staffed)

Russell

**From:** Michael Graham <michael.graham@nvdevices.com>
**Sent:** Friday, August 31, 2018 10:21 AM
**To:** Russell Smith <russell.smith@carson-industries.com>
**Cc:** Richard Barrett <richard.barrett@carson-industries.com>; Richard Barrett <rbarr43964@aol.com>; Maria Estrada <maria.estrada@carson-industries.com>
**Subject:** RE: Demo units

Russell,

Per our phone conversation yesterday we will lend you a system to take for this DEMO.  Please let me know when you are planning on leaving so I can be sure to get this system built up and in your hand in time.  Thank you.

Best Regards,

*Michael Graham*
Director of Operations
Night Vision Devices, Inc.
(610) 395-9743 Ph.
(610) 395-9744 Fax
http://www.nvdevices.com

This e-mail and any files transmitted with it may be proprietary and are intended solely for the use of the individual or entity to whom they were and are addressed. If you have received this e-mail in error please notify the sender immediately. Please note that any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of Night Vision Devices Inc. The recipient of this e-mail should also check this e-mail and any attachments for the presence of viruses. Night Vision Devices Inc. accepts no liability for any damage caused by any virus transmitted by this e-mail.

**From:** Russell Smith <russell.smith@carson-industries.com>
**Sent:** Thursday, August 30, 2018 10:35 AM
**To:** Michael Graham <michael.graham@nvdevices.com>
**Cc:** Richard Barrett <richard.barrett@carson-industries.com>; Richard Barrett <rbarr43964@aol.com>; Maria Estrada <maria.estrada@carson-industries.com>
**Subject:** RE: Demo units

Mike,
OK we have everything going on our visit to Colombia.

What I need from you is:

Mini BNVD AA fixed Battery Compartment, Light Weight Optics
White Tube 64 LP/mm 1600 FOM  10160 style (NO MANUAL GAIN)
As clean as possible

Send me a price and we will give a PO today...Unless you want to Loan it to us as a DEMO

I need this unit ASAP so when we get the License we can GO....

Russell

**From:** Michael Graham <michael.graham@nvdevices.com>
**Sent:** Monday, August 20, 2018 5:16 PM
**To:** Russell Smith <russell.smith@carson-industries.com>
**Cc:** Richard Barrett <richard.barrett@carson-industries.com>; Richard Barrett <rbarr43964@aol.com>
**Subject:** RE: Demo units

Russell,

Per your request here is the pricing on the Demo units.

Price on the UL Demo kit with removeable AAA batt compartment is: $3185, includes Battery pack and assembly.

Price on the UL Demo kit, with push button upper and AA (FIXED) battery is: $2750, includes assembly

This would be with Carson sending us the image tubes and NVD installing them into the systems.

If you have any questions or require any additional information please free to contact me.

Best Regards,

*Michael Graham*
Director of Operations
Night Vision Devices, Inc.
(610) 395-9743 Ph.
(610) 395-9744 Fax
http://www.nvdevices.com

This e-mail and any files transmitted with it may be proprietary and are intended solely for the use of the individual or entity to whom they were and are addressed. If you have received this e-mail in error please notify the sender immediately. Please note that any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of Night Vision Devices Inc. The recipient of this e-mail should also check this e-mail and any attachments for the presence of viruses. Night Vision Devices Inc. accepts no liability for any damage caused by any virus transmitted by this e-mail.

**From:** Russell Smith <russell.smith@carson-industries.com>
**Sent:** Friday, August 10, 2018 1:24 PM
**To:** Michael Graham <michael.graham@nvdevices.com>
**Cc:** Richard Barrett <richard.barrett@carson-industries.com>; Richard Barrett <rbarr43964@aol.com>
**Subject:** RE: Demo units

Mike,
I just need the Kits...
We will use our own tubes for the Demo units

Russell

**From:** Russell Smith
**Sent:** Friday, August 10, 2018 10:25 AM
**To:** 'Michael Graham' <michael.graham@nvdevices.com>
**Cc:** Richard Barrett <richard.barrett@carson-industries.com>; Richard Barrett <rbarr43964@aol.com>
**Subject:** Demo units

Mike,
I am going to Colombia for a Binocular demo to the new administration
I need to get two Demo units

Mini BNVD AA 18MM Night Vision Binoculars
No Gain—They must have MX10160 tubes (L-3)
AA battery removeable cartridge
RPO Optics (light Weight)
1600 FOM tubes 1.0 halo Max. .85 Min.
One Green set (P43),
One White set (P45)
Battery Pack (one)
Standard Accessory Pack

How do I make this happen?
I am leaving on Sept. 2

Russell